(No. 10839.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DANIEL DONAHOE, Plaintiff in Error.

*Opinion filed June 21, 1917—Rehearing denied October 3, 1917.*

1. CRIMINAL LAW—*Supreme Court may, in its discretion, consider errors not argued in Appellate Court.* The rule that alleged errors of the trial court not argued or brought to the attention of the Appellate Court will be held to have been waived and abandoned may be disregarded by the Supreme Court, in its discretion, where its application would result in great injustice.

2. SAME—*all counts of indictment need not be good if some are sufficient.* An indictment for conspiracy will be sufficient if some of its counts state the charge in sufficiently technical language so plainly that the nature of the offense charged can be readily understood by the defendant and by the jury.

3. SAME—*good reputation may raise a reasonable doubt as to guilt.* Evidence that a man has all his life maintained a good reputation for honesty and integrity is not proof of innocence when he is charged with crime, but it may be sufficient, under the circumstances, to raise a reasonable doubt of his guilt.

4. SAME—*when proof of good reputation is not sufficient to justify an acquittal.* If, considering the proof of good reputation together with all the testimony in the case, a reasonable doubt is entertained of the defendant's guilt he is entitled to an acquittal, but not where the evidence, outside of such proof, leaves no reasonable doubt of his guilt.

5. SAME—*when attorney is not exempted from prosecution for his actions in connection with a case he has conducted.* The privilege of an attorney which exempts him from prosecution for anything he does or says in bringing and prosecuting a suit in a judicial tribunal does not exempt him from being prosecuted for a conspiracy, in which the bringing of his suit is one step or element.

6. SAME—*when character witnesses should not be asked if they had ever heard the defendant's reputation questioned.* Character witnesses who have testified that the general reputation of the defendant was good prior to the date of the alleged crime should not be asked if they had ever heard his reputation questioned prior to that time.

7. SAME—*what argument by prosecuting attorney is not a reference to fact that defendant did not testify.* An argument by the prosecuting attorney, in a prosecution for conspiracy, commenting on the fact that the source from which certain money came which

was used by the defendant was unexplained by the defense is not a reference to the fact that the defendant did not testify.  ·

8. SAME—*prosecuting attorney may call jury's attention to fact that People's witnesses have not been contradicted.* The prosecuting attorney in his argument to the jury may call their attention to the fact that the testimony of witnesses for the prosecution has not been contradicted, even though the defendant, who is the only person who could contradict such testimony, has not testified.

9. SAME—*when error in refusing to compel witness to remove veil is not prejudicial.* The jury should have an opportunity to look into the face of a witness and observe its expression, and if a veil worn by a witness entirely obscures her face, error in refusing to compel her to remove the veil may be prejudicial, but such is not the case where the veil is so transparent that the jury may readily see through it.

WRIT OF ERROR to the First Branch Appellate Court for the First District;—heard in that court on writ of error to the Criminal Court of Cook county; the Hon. HUGO PAM, Judge, presiding.

LEO L. DONAHOE, (DANIEL DONAHOE, *pro se,* of counsel,) for plaintiff in error.

P. J. LUCEY, Attorney General, MACLAY HOYNE, State's Attorney, and GEORGE P. RAMSEY, (HAYDEN N. BELL, MARVIN E. BARNHART, and EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

The plaintiff in error, Daniel Donahoe, Isaac Stiefel, Aileen Heppner and "divers other persons whose names are to said grand jurors unknown," were indicted by a grand jury of Cook county for a conspiracy against Clarence S. Funk. Plaintiff in error and Stiefel were tried in the criminal court of Cook county under said indictment. Plaintiff in error was convicted and Stiefel acquitted. Aileen Heppner was not tried. Plaintiff in error was fined $2000, and sued out a writ of error from the Appellate Court for the First District to review the judgment. That court affirmed

the judgment, and plaintiff in error has sued out a writ of error from this court.

The indictment originally contained thirty-five counts. Eight of them were quashed before or during the trial of the case and the cause was submitted to the jury on twenty-seven counts. A motion to quash the indictment, and each count thereof, before the trial, and a motion in arrest of judgment, were made and overruled. Some of the counts, in substance, charged defendants with a conspiracy to defame the good name, credit and reputation of Clarence S. Funk, and to obtain for themselves divers sums of money by charging and accusing said Funk with having committed adultery with and having debauched and carnally known · Josephine Henning, the wife of John Henning. Other counts, in substance, charged defendants with conspiring to falsely accuse and publish of Clarence S. Funk that he had debauched and carnally known Josephine Henning, the wife of John Henning, with intent to injure the character and reputation of said Funk and defraud him of money. Other counts, in substance, charged defendants with conspiring to falsely accuse said Clarence S. Funk with having debauched and carnally known Josephine Henning, wife of John Henning, and to extort money from him by maliciously and unjustly bringing an action against said Funk, in the name of John Henning, for damages for debauching Henning's wife and alienating her affections, and to offer and give in evidence, to maintain the issue in said suit, perjured, false and corrupt testimony. Other counts charged defendants with conspiring, fraudulently and wrongfully, to do an illegal act injurious to the administration of public justice by obtaining a judgment by means of corrupt and false testimony to be produced in a case pending in the circuit court of Cook county, wherein the declaration alleged Clarence S. Funk had debauched Josephine Henning, the wife of John Henning, and had alienated her affections from her said husband.

A large part of the brief and argument of plaintiff in error in this court is devoted to the contention that the indictment was bad, that no offense is charged in any count thereof, and that the court erred in overruling the motion to quash it and also erred in overruling the motion in arrest of judgment. The sufficiency of the indictment was not argued in the Appellate Court except in a petition for rehearing. A number of other errors argued extensively in this court were not argued in the Appellate Court except in the petition for a rehearing. That court, in a per curiam opinion denying the petition for a rehearing, said there were no exceptional circumstances showing that the new matter argued in the petition for a rehearing would materially affect the merits of the controversy as to the guilt of plaintiff in error or that there had been a great injustice done, and that court declined to consider the new questions argued in the petition for a rehearing, further than to hold that there were at least some good counts in the indictment.

The brief of plaintiff in error in the Appellate Court is not signed by counsel now representing him, and it is very earnestly urged in his reply brief in this court that counsel for plaintiff in error in the Appellate Court did not intend to waive any of the errors assigned in that court, which embraced the sufficiency of the indictment, the giving and refusing of instructions and the admission and rejection of certain testimony. The rule is that alleged errors in the ruling of a trial court not argued or brought to the attention of the Appellate Court will be held to have been waived and abandoned and cannot be raised for the first time in this court. (*Dunn* v. *Crichfield,* 214 Ill. 292, and cases there cited.) This is not a hard and fast rule, and where this court can see that the application of it would result in great injustice it will not be blindly adhered to. We have therefore at the very earnest request of counsel for plaintiff in error considered the indictment and the argument in sup-

port of the contention that the indictment, and every count thereof, is insufficient.

We have above very briefly referred to the substance of the charges contained in the various counts of the indictment, which is too voluminous to set out fully in this opinion. We have also considered the able and ingenious argument of counsel attacking its sufficiency, and are satisfied the court did not err in overruling the motion to quash or in arrest of judgment. No good purpose could be served by setting out the particular objections made to the indictment and to each count, and without determining whether all the counts of the indictment were good, it is sufficient to say that at least most of them were, and stated the charge in sufficiently technical language so plainly that the nature of the offense charged could be readily understood by the defendants and by the jury. (*Gallagher* v. *People,* 211 Ill. 158; *Tedford* v. *People,* 219 id. 23; *People* v. *Smith,* 239 id. 91.) The indictment sufficiently charged defendants, in different counts and in varying language, with a conspiracy to defame said Clarence S. Funk and falsely accuse him; to extort money from him by means of a conspiracy; to bring and prosecute a suit against him on behalf of John Henning for the alienation of his wife's affections; to support the issues in said suit by false and perjured testimony; and to do an illegal act injurious to the administration of public justice by obtaining a judgment against Funk in said suit by means of false, corrupt and perjured testimony.

It will be necessary to an understanding of the questions involved to state some of the facts and at least some of the testimony.

On October 14, 1911, an action for $25,000 damages was begun in the circuit court of Cook county by John Henning, as plaintiff, against Clarence S. Funk. The declaration charged defendant with alienating the affections of Josephine Henning, plaintiff's wife, and alleged that on October 15, 1910, and on divers other days subsequent to that

time and prior to the commencement of the suit, defendant debauched and carnally knew plaintiff's wife, alienated her affections and deprived plaintiff of the comfort, fellowship, society and aid of his said wife. Plaintiff in error's name was signed to the declaration as one of plaintiff's counsel. Funk denied the charge, and the case was tried in June, 1912. Plaintiff in error conducted the trial for the plaintiff. Defendant was found not guilty.

Over the objection of plaintiff in error the trial court in this case admitted in evidence the papers, files and the transcript of the testimony of the witnesses who testified on the trial of the damage suit in Henning *vs.* Funk. On that trial Henning testified to his marriage with Josephine Henning and that he lived with her up to about October 1, 1911; that on the day his suit was brought against Funk, October 14, 1911, he was at the Hotel Bienville, in Mobile, Alabama; that his wife came down there later, but that he could not state the exact time, and that he lived with her there at the hotel. He testified he was not expecting her there and did not know she was coming; that he had no such understanding with her when he left Chicago about the first of the month and that he did not know where she was at the time of the trial; that he had not seen her for three months; that he had worked at various occupations in hotels, restaurants and for the city railway company, and was a man of little means. He testified his relations with his wife had been severed.

Aileen Heppner was a witness in the damage suit of Henning *vs.* Funk, and testified she was unmarried, knew the Hennings and had lived with them about six weeks in 1909; that she was cashier for the Auditorium pharmacy in 1907, and that she knew who Clarence S. Funk was when she saw him; that on December 20, 1909, she saw Josephine Henning and Funk together enter a bed-room in the Grand Pacific Hotel, and again in 1910 she saw them enter rooms in the Auditorium and Congress Hotels.

Edwin Deuter, formerly a bell-boy at the Grand Pacific Hotel, testified on the trial of the case of Henning vs. Funk that he saw Funk and Mrs. Henning in a bed-room in the Grand Pacific Hotel in January, 1910, and served them drinks and cigarettes.

Funk testified in the suit brought by Henning against him and denied he ever knew Mrs. Henning, denied he had been in a room with her at any hotel or that he had ever had any relations with her whatever.

T. A. Fortner testified on the trial of the suit of Henning vs. Funk that he knew Henning, and that in the early part of October, 1911, Henning told him he was fixing a scheme to get some easy money. Later Henning told Fortner he was to meet some of the best lawyers in Chicago, have lunch with them and would go south or west for a vacation. The day following this conversation Henning showed the witness a bank roll and a ticket to Mobile, Alabama, and asked him about hotels in that city. Fortner could not say how much money Henning had, but thought $300 or $400. Within ten days before that time Henning was in financial trouble and had asked the witness for assistance. After Henning had gone away Fortner received a letter and post-card from him which he testified were in Henning's handwriting. The letter was postmarked Mobile, Alabama, and described what a good time Henning was having. He stated in the letter he did not know how long he would be there, as that would depend upon how Mrs. Henning liked the place, but he thought she would enjoy it. The letter further states: "It is great not to give a damn for expenses and be able to go any old place without thinking of time or cost." Fortner testified he next saw Henning October 20, 1911, at St. Louis; that, acting under instructions from and being in the employment of one of counsel for Funk, he met Henning at St. Louis and traveled with him from there to Chicago; that he talked with him about his litigation against Funk, but Henning was not

279 — 27

inclined to talk about it and would not say whether he knew the names of the men who furnished the money he went away on. He did say the plaintiff in error and his partner showed him a signature to a guaranty of some kind, and that Henning said many other things of a compromising nature. Henning inquired of witness if he received the letter and post-card from Mobile.

The transcript of other testimony heard at the trial of Henning *vs.* Funk tending to show that suit was not brought in good faith but for the purpose of injuring and defaming the name and character of Funk and to extort money from him was introduced, also depositions of witnesses in Mobile, Alabama, taken and read on the trial of the case of Henning *vs.* Funk, wherein the witnesses testified to Henning arriving in Mobile, taking a room at a hotel, where he was a few days later joined by a woman he claimed was his wife, and that during their stay at the hotel they occupied the same room and apparently were friendly and affectionate. The Hennings, according to the testimony, left Mobile separately the latter part of October, 1911, and returned to Chicago by different routes, arriving at different times.

On the trial of this case in the criminal court Josephine Henning was a witness for the prosecution. She testified that along about the last of July or first of August, 1911, Aileen Heppner called her by telephone and said she had been away six or eight weeks with a man by the name of Dan, and that she had a little scheme to make some money and wanted the witness to meet plaintiff in error. That same evening the witness met Miss Heppner, and together they went to the office of plaintiff in error at about 7:30 o'clock. Plaintiff in error was the only one in the office. Miss Heppner introduced the witness as Miss O'Reilly and said, "This is the girl." Plaintiff in error asked witness for her telephone number and said he would call her later. Witness saw plaintiff in error the next evening, about the same hour, at his office. He inquired where she lived, when

and where she was born, who her people were, where she had been employed, and said he was going to bring a little suit. He asked her if she knew anyone belonging to the Harvester Company, or Mr. Funk, and witness said she did not. Plaintiff in error said he would fix that all right; that the only thing he wanted her to do was to be loyal to him. About three days later he called witness and asked her to come to his office. She went, and plaintiff in error gave her $100. He told her if she would be loyal to him she need not worry for the rest of her life. Witness told him if anybody was going to be hurt or any notoriety made she wanted nothing to do with it, and plaintiff in error assured her there would be nothing of the kind. He asked her to bring her husband down, and witness said she would try. About two weeks later plaintiff in error called witness and asked her to bring her husband to his office. Witness went with her husband to the office of plaintiff in error and introduced them. They retired into another room and witness did not hear their conversation. A few days later witness' husband at the request of plaintiff in error went to his office and witness went with him. Plaintiff in error said he wanted witness' husband to go away, and he asked witness if she could go in a few days. It was arranged they were to go to Mobile, Alabama, as soon as they could get away. Witness' husband left Chicago about the first of October. Up to that time the witness testified she had received from plaintiff in error $400. Witness followed her husband to Mobile a few days later. Before witness left Chicago plaintiff in error asked her to meet a Mrs. Dowd. When he introduced them he said Mrs. Dowd would come to the witness with word or money and he wanted the witness to know her. Plaintiff in error gave witness $200 and railroad and Pullman transportation to Mobile to join her husband. A Mrs. Oviatt went with her to the station in Chicago on her departure. On her arrival at Mobile she was met at the station by her husband

and went with him to the Bienville Hotel, where they lived together as husband and wife during their stay of several days there. While there the suit of Henning *vs.* Funk was brought and was given much notoriety in the newspapers. They became uncomfortable, and William D. Bennett, of Chicago, visited them at the hotel with documents for his identification to them. He told them the plaintiff in error wanted them to come back to Chicago and advised that they go by different routes. He gave them $200 and they left Mobile separately, Henning going *via* New Orleans and St. Louis and Mrs. Henning direct to Chicago. Witness went to the Del Prado Hotel and called up plaintiff in error. He said he would see her the next evening, at which time the witness went to his office. Witness complained that the affair had got in the newspapers and charged the plaintiff in error had not kept his word with her. He promised there would be nothing further in the matter and that it would be dropped right away; that the case would not go to trial. Witness had become very nervous and went from the Del Prado Hotel to the Drexel Arms Hotel. After a stay there of a week or ten days, during which time she saw plaintiff in error once, he gave her some money and said he was making arrangements to get a place for her to stay. Bennett took her to the place provided for her, and her husband stayed there with her. It was a house on the west side. After staying there a week or ten days they went to what the witness called the Bennett flat, on Ashland avenue. Witness, her husband, Bennett and brother occupied the flat. Bennett had brought money to witness which he said plaintiff in error had sent her. Plaintiff in error came out to the flat three times. The second time he brought a doctor to treat the witness, who was then ill. The doctor visited her twice. Bennett brought her $200 which he said plaintiff in error sent her, and she went to Mudlavia, Indiana. Mrs. Dowd went with her. The witness' expenses at the hotel there were $5 a day.

Bennett came to see her there about four times, bringing money, which he said was from plaintiff in error, on the occasion of at least three of his visits. Witness remained there about six weeks under the treatment of a physician and then went to a sister at Bloomington, Illinois. After staying at her sister's a few days she went to Minneapolis, where Mrs. Dowd visited her and brought her $200 which she said was from plaintiff in error. From Minneapolis witness went to New Orleans, where she remained at a hotel about six weeks. Mrs. Dowd visited her there about three times and brought her money which she said was from plaintiff in error. From New Orleans witness went to Pass Christian, Mississippi, and from there returned to New Orleans. Mrs. Dowd visited her at Pass Christian and gave her $200 which she said was from plaintiff in error. In company with Mrs. Dowd she returned from New Orleans to Chicago to apartments on the north side, which Mrs. Dowd said had been prepared for her and where she was to be cared for by Mrs. Catherine Ryan. Mrs. Dowd said the flat had been procured for her by plaintiff in error. The witness became dissatisfied with Mrs. Ryan and told plaintiff in error she did not want to stay there any longer. He requested her to try to stand it a little longer and said he would try to make other arrangements. He gave her $200 and she remained a few days. She was receiving medical treatment from Dr. McKinloch. She paid neither of the doctors who treated her. She then went to the Plaza Hotel, where Mrs. Dowd brought her some money from plaintiff in error and told her he wanted to know how she was feeling. From the Plaza Hotel the witness went to the Alexandria Hotel, where she stayed a couple of weeks. During her stay at the Alexandria Hotel she visited plaintiff in error at his office. He talked of her going to Atlantic City, but thought it was too cold and suggested that she wait a while before going. She went from the Alexandria Hotel to Atlantic City, accompanied by Mrs. Oviatt. Just

before she left for Atlantic City plaintiff in error gave her transportation and $200 and told her the case would never come to trial. Witness lived at a hotel in Atlantic City and her expenses were $5 a day. She was there six weeks under an assumed name. Mrs. Dowd visited her once and brought her $200. Mrs. Oviatt stayed with her about two weeks. Witness read in the papers that the suit of Henning *vs.* Funk had been tried while she was in Atlantic City. The day after reading of the trial she left for Philadelphia and from there went to New York. From New York she telegraphed Frank H. Scott, of the firm of Scott, Bancroft & Stephens, Funk's attorneys. Scott, accompanied by Thomas Marshall, an assistant State's attorney, went to New York and met the witness. She returned with them to Chicago and testified before the grand jury that returned the indictment. She testified she did not know Clarence S. Funk and had never seen him.

In connection with the testimony of Mrs. Henning there were offered in evidence several sheets of paper containing typewritten questions purporting to have been propounded to the witness and answers made by her to plaintiff in error in his office before the suit of Henning *vs.* Funk was begun. According to that document the witness answered questions propounded to her to the effect that she knew Funk and that he had taken her riding in a taxicab a number of times, that she had several times occupied the same bed with him in a room in the Grand Pacific Hotel, and that he had several times given her money, $50 at a time. The witness admitted the signature to the paper was hers but denied reading it before signing it, and denied she was ever asked the questions or made the answers about her relations with Funk.

John Henning testified on the trial of this case that he went to plaintiff in error's office with his wife about September 23 or 24, 1911, which was the first time the witness had ever seen plaintiff in error. Witness' wife intro-

duced them, and plaintiff in error inquired where witness was working, how long he had been working, etc.  He said certain parties were going to bring a suit and asked if witness knew Clarence S. Funk.  Witness said no, and plaintiff in error said certain parties were going to bring a suit against Funk; that he was instructed by those parties to say to witness and his wife they would be well taken care of as long as they lived and would never have to worry about anything.  He gave the witness $150 and witness' wife some money.  About three nights later witness saw plaintiff in error at his office and signed a paper which he was asked to sign by plaintiff in error.  Witness read the paper and expressed a desire to know how far he was going.  Plaintiff in error said nothing would ever come of it.  As witness understood it, a suit was to be brought by him as plaintiff against Funk for alienating Mrs. Henning's affections.  Three or four days later witness saw plaintiff in error in company with Mrs. Henning.  Plaintiff in error said they would have to leave where they were living; that reporters would probably be out hunting them; that he would take care of their lease and advised them to store their furniture, and suggested Mobile, Alabama, as a place for them to go, and asked when they could leave.  Mrs. Henning said she could not go for three or four days and witness said he could 'go in a day or two.  A day or two later the witness saw plaintiff in error and had lunch with him.  Plaintiff in error gave witness $200 and transportation to Mobile.  Witness detailed his trip to Mobile, where he stopped and what he did while there, and of being joined there by his wife.  While there he saw in the papers the suit of Henning vs. Funk had been filed, and wrote plaintiff in error that reporters were disturbing him and his wife and that they wanted to leave there.  Before they left a man came to their room, knocked at the door and inquired if Mr. Henning was there.  He said he came from plaintiff in error's office, and showed documents to identify him.

It was William D. Bennett. He said the plaintiff in error wanted witness and wife to return to Chicago and suggested they return by different routes. The witness returned *via* St. Louis, and by arrangement met Bennett at the Jefferson Hotel,-in that city. He met T. A. Fortner on the train from St. Louis to Chicago and talked with him but could not remember the conversation. On arrival at Chicago he went to the Chicago Beach Hotel. The next day he saw plaintiff in error at his office and also saw Bennett, who was there. Witness described his movements in Chicago, corroborating some of the testimony of Mrs. Henning as to her movements there and where they lived. About the middle of November Bennett brought C. C. Palmer to the house where witness was living, and it was arranged that witness should go to Peoria, where Palmer would open an office to sell Minnesota land. Witness was to receive $25 a week for his work in the sale of the land. Witness went to Peoria, where he met Palmer. He remained in Peoria under an assumed name until the latter part of April. He sold no land but received $25 a week from Palmer. He saw plaintiff in error and Bennett in Peoria at Palmer's office. They asked him to sign a paper, and he did so. After witness left Peoria and returned to Chicago plaintiff in error gave him $200 and railroad transportation to Los Angeles and said a party would get in communication with him there. He told the witness what hotel to go to. When he arrived at the hotel he found a card for him asking him to call and see the party, and he did so. The man was a contractor and the witness was engaged to work for him. Bennett called on witness in Los Angeles and told him the trial was coming on and there was just time to get back to Chicago, and witness left at once for Chicago. Bennett returned with witness, and on the way back to Chicago they discovered they were being watched. From Denver witness came on to Chicago alone. On arriving at Chicago he went to plaintiff in error's office. The trial came on the next

day. Witness asked plaintiff in error if he would have to go on the stand, and plaintiff in error said he did not think so; that he would not put him on unless he had to. Witness was placed on the stand the last or next to the last day of the trial. After the trial was concluded witness and Palmer went to plaintiff in error's office. Plaintiff in error came in excited and said they would have to get out of town. Plaintiff in error and Palmer went into an office, and when they came out plaintiff in error told witness to stick with Charlie,—meaning Palmer; that he had given him some money and that everything would be all right. This occurred about five minutes after witness had left the court room. Witness and Palmer went to the Galt House, at Madison and Market streets, and stayed there until they left for Minnesota, their destination in that State being Demidji. They remained there three or four days, when Palmer came down to Minneapolis. He returned to Demidji and said he saw from an article in the newspaper that they were looking for the witness. They then left Demidji and went to a lumber station called Hines, where witness remained until October 1, 1912. Palmer would make trips to Chicago and when he returned would report how things were going there, and witness thus learned about the indictment in this case being returned and his wife's testimony before the grand jury. Witness detailed his travels after leaving Hines, Minnesota, to Oregon, back to Chicago, then to Jacksonville, Florida, from there back to Minneapolis, then to Hines, Minnesota, and his arrest in Minneapolis and return to Chicago in October, 1913. He testified Palmer was with him in his travels or met him in the various places he stopped and supplied him with means, except when he was in Chicago, when he received them from plaintiff in error or someone representing him. After the witness was brought under arrest to Chicago he made a statement in response to questions propounded to him by counsel for Funk.

Edwin W. Deuter testified on this trial that he worked
as a bell-boy, as cigar clerk and as clerk in the bar of the
Grand Pacific Hotel in 1908, 1909 and 1910. He became
acquainted with defendant Isaac Stiefel in 1911. Denny
Martin asked him to meet Stiefel. Martin said Stiefel had
given him $25 and asked him if he knew Funk and showed
him a picture of him, and inquired if Martin knew any
other boys at the Grand Pacific Hotel. Martin knew wit-
ness and took him to meet Stiefel, who asked witness if
he knew Funk and told him about the suit of Henning *vs.*
Funk. He gave witness $25 and gave him to understand
that he was looking for someone to testify to having seen
Funk and Mrs. Henning together at the Grand Pacific Ho-
tel. Witness met Stiefel again, and after Stiefel talked to
him and gave him another $25 witness was told to go see
plaintiff in error, which he did. Plaintiff in error told him
if he would be a witness in the case he would get a position
for him, and said many big men obtained their start that
way. Witness said that every time he had an interview
with plaintiff in error he was given money. Plaintiff in
error did obtain a position for the witness in a wholesale
meat market at $25 a week, which was paid him though he
rendered no services. Before the case of Henning *vs.* Funk
was called for trial plaintiff in error showed the witness a
list of dates when Funk was supposed to have been seen
at the hotel with Mrs. Henning, and instructed him specially
about the date January 10, 1910, that being the date the
witness testified in the Henning *vs.* Funk case he served
them with drinks and cigarettes in the room. The plain-
tiff in error asked witness questions and had Lamble, a
stenographer, take them down in shorthand. These ques-
tions and answers were transcribed in typewriting and pro-
duced on the trial of this case. Just before the trial of
Henning *vs.* Funk plaintiff in error introduced Aileen Hepp-
ner to the witness and told her to take a good look at him
so she would recognize him. On the trial Miss Heppner

identified Deuter as a bell-boy she saw going into the room of Funk and Mrs. Henning in the Grand Pacific. Plaintiff in error paid Deuter about $250, and that, together with what Stiefel paid him and what he received from the west side meat market, amounted in all to about $1025.

Edwin Slavin, another bell-boy at the Grand Pacific Hotel, attended the trial of Henning *vs.* Funk for the purpose of testifying as a witness for the plaintiff. Before he was called to testify he disappeared and was not a witness in that case. He testified on the trial of this case to being interviewed by Stiefel and plaintiff in error about testifying in Henning *vs.* Funk that he had seen Funk and Mrs. Henning in a room in the hotel, and that he was paid money from time to time, aggregating approximately $1000.

Dr. Byrnes testified on the trial of this· case that in November, 1911, he was twice requested by plaintiff in error to go and see a client of his. Plaintiff in error called at the doctor's office and went with him. The patient was a lady, but the doctor did not remember the·name she was introduced to him by. He said she resembled very much the lady he saw before the grand jury who was introduced as his patient, but he would not state positively. Plaintiff in error paid him $10 for his services.

Dr. McKinloch testified he visited Mrs. Henning at an apartment occupied by her and Mrs. Ryan. He was called by Mrs. Ryan and visited the patient about four times and prescribed for her, and was paid $14 for his services by Mrs. Ryan, whom he had known for three years.

There was much other testimony corroborative of the testimony above set out and tending more or less to establish the guilt of plaintiff in error. That conclusion could not reasonably.be escaped unless much of the testimony for the prosecution should be regarded as unworthy of belief. It is true the Hennings, Deuter and Slavin do not appear in a very enviable position. Henning and Deuter confessedly testified falsely on the trial of Henning *vs.* Funk, and Mrs.

Henning confessedly lent herself to the scheme of bringing and prosecuting the suit, while she testified on this trial,— and we think that is clearly the truth,—that she did not know and had never seen Funk before the suit was brought. But whatever may have been their former conduct and testimony, their testimony on the trial of this case received such corroboration from the testimony of other witnesses and from facts and circumstances shown by the evidence that we cannot say their testimony in this case should not have been believed or considered. The whole evidence considered impresses us that the guilt of plaintiff in error was clearly established. There is always the possibility that an error may be committed from basing a conclusion on human testimony, but in this case the possibility of such an error is so extremely remote that it must be held the truth of the charge was proven beyond any reasonable doubt.

The only witnesses called to testify on behalf of plaintiff in error were witnesses as to his good reputation as a citizen and man for honesty and integrity prior to his indictment in this case. Seventy-three witnesses, including judges of the various courts in Cook county, prominent lawyers and citizens, testified that prior to July, 1912, the date of the return of the indictment in this case, plaintiff in error had borne a good reputation for honesty and integrity in the community in which he lived. It is insisted this testimony should weigh heavily in favor of plaintiff in error, and this is true. That a man has all his life maintained a good reputation for honesty and integrity should stand him in good stead when he is charged with the commission of a crime. It is not, however, proof of innocence but it may be sufficient to raise a reasonable doubt of a defendant's guilt of the crime with which he is charged. If, considering the proof of good reputation together with all the testimony in the case, a reasonable doubt arises or is entertained of defendant's guilt he is entitled to an acquittal, but where, notwithstanding proof of good reputation,

the testimony leaves no reasonable doubt of his guilt, the fact that he had previously borne a good reputation would not authorize or justify his acquittal.

It is contended by plaintiff in error that as an attorney at law he is privileged from prosecution for his connection with and actions in the case of Henning vs. Funk; that this privilege extends to all judicial proceedings in the case and embraces all documents used in and evidence heard upon the trial of that case, and that it was error to admit in evidence the files and papers in that case and the transcript of the testimony of witnesses heard on that trial. The privilege of an attorney which exempts him from prosecution for anything he does or says in bringing and prosecuting a suit in a judicial tribunal has, we think, never been understood as exempting him from prosecution for a conspiracy in which the bringing and prosecution of a suit was one step or element. Plaintiff in error was not here indicted for the bringing and prosecution of the suit of Henning vs. Funk. He was indicted for a conspiracy to defame, injure and extort money from Funk and to do illegal acts injurious to the administration of public justice. If he had been sued for malicious prosecution, libel or slander for bringing and prosecuting the suit of Henning vs. Funk plaintiff in error's argument on this branch of the case would be more applicable. There was proof made by the prosecution tending strongly to show a conspiracy, and plaintiff in error's connection with it, before the files and papers in Henning vs. Funk and the testimony in that case were offered in evidence. We think it was competent to show plaintiff in error's connection with that suit as one of the elements or steps in the conspiracy, (*Spies* v. *People,* 122 Ill. 1,) and that the files and papers in that case and the transcript of the testimony of the witnesses who testified on that trial were competent, except, perhaps, the admission in evidence of the affidavit of Funk, filed in that case in support of a motion to advance the

cause for trial, in which affidavit it was stated the suit of Henning *vs.* Funk was not brought in good faith but to accomplish an ulterior purpose. The affidavit also set out an alleged statement of Edward Hines to Funk at the Union League Club about Lorimer's election to the United States senate, and Funk's testimony to that conversation before a committee of the Illinois legislature and a committee of the United States senate. That affidavit should not have been admitted, but the error is not, alone, sufficient to require a reversal of the judgment.

Clarence S. Funk, a witness in this case, was asked by counsel for the prosecution if he was interested in or took any part in an investigation at Springfield, Illinois, in April, 1911. He was permitted to answer the question over the objection of plaintiff in error, and said he was before an investigating committee of the Illinois legislature and a senate investigating committee at Washington in June, 1911, at which time he testified he had been approached by Edward Hines in the Union League Club, Chicago, with a request for a contribution of $10,000 to assist in reimbursing certain parties not named who had raised a fund of $100,-000 "to put Lorimer over." The committees he testified before were investigating the legality of Lorimer's election to the United States senate. Funk testified he did not know Mrs. Henning, that no demand was ever made upon him by either Henning or plaintiff in error, and that the first he knew of the suit against him was through the Chicago newspapers. Mrs. Henning testified that on one occasion plaintiff in error asked her if she knew Funk or anyone connected with the Harvester Company. Plaintiff in error said he was the man who brought about the second investigation of Lorimer. Deuter testified that plaintiff in error asked him if he had seen by the papers that a millionaire lumberman had brought a suit against Funk. Witness replied he had, and plaintiff in error said, "He is our friend; he is the same way as we are and he will be our friend."

He said this conversation occurred about the time it was published in the newspapers that Hines had brought suit for $100,000 against Funk. Slavin testified that defendant Stiefel showed him a picture of Mrs. Henning and one of Funk and asked him if he knew them. Witness said he knew Funk from having seen him around the hotel where witness worked. Stiefel inquired of witness if he had any grievance against Lorimer or Hines. Witness said he knew Lorimer from having read about him in the newspapers and knew Hines from having seen him around the Grand Pacific Hotel but had no grievance against either of them.

That Funk had testified before an investigating committee inquiring into the legality of the election of Lorimer to the United States senate and what he stated to said committee was offered as tending to show a motive for the conspiracy. We think it was competent for that purpose. Its value and what it proved were questions for consideration by the jury.

The prosecution notified plaintiff in error before the trial that Mrs. Dowd, Catherine Ryan, C. C. Palmer and William D. Bennett would be produced as witnesses on the trial. None of them were present when the case was heard, and Thomas Lynch, a police officer, was permitted, over objections of plaintiff in error, to testify that he had been given a subpœna for the said witnesses by the prosecution, what efforts he had made to find said witnesses and that he had been unable to find them. It is contended by plaintiff in error that upon the theory of the prosecution said witnesses were co-conspirators with plaintiff in error; that although they were not specifically named in the indictment they were made defendants by the description, "divers other persons whose names are to said grand jurors unknown." The testimony of the witness was admitted as explanatory of why said four persons had not been called to testify in the case. It is argued by plaintiff in error that the notice given by the prosecution that said four witnesses would

be called to testify on the trial was a subterfuge to afford a basis for the testimony of the officer and for argument to the jury that the witnesses had left the jurisdiction of the court or were in hiding. We cannot assume the prosecution was acting in bad faith. According to the testimony offered by the prosecution the absent parties were in a position to give most important testimony, and it was not improper for the prosecution to show it had made efforts to produce them and was unable to do so. They were not named as defendants in the indictment and were not necessarily embraced in the description in the indictment of "unknown parties."

Character witnesses for plaintiff in error who testified that his general reputation prior to July, 1912, was good, were also asked if they had ever heard his reputation questioned before that time. On objection by counsel for the prosecution the witnesses were not permitted to answer that question, and this it is claimed was erroneous. In the first place, the court's action is in accord with the rule in this State. (*Gifford* v. *People,* 148 Ill. 173, and cases there cited.) In the second place, if the ruling had been erroneous it was harmless, for the witnesses had already testified to their acquaintance with plaintiff in error, the length of time they had been acquainted with him, that they knew his general reputation, and that it was good. It does not seem to us their testimony would have been strengthened by whatever answer they might have made to the question whether they had ever heard his reputation questioned.

It is also complained that counsel for the prosecution made improper remarks in his argument to the jury. The assistant State's attorney in his argument said the defendants would have to tell the jury where the money came from,—referring to the money paid the Hennings and some of the witnesses. He inquired whose it was, and said plaintiff in error and Stiefel handled it, "and they won't tell you who he is,—they won't bring him in." Referring to a cer-

tain statement alleged to have been made by the witness Slavin in the presence of Stiefel, Ahern and others, the assistant State's attorney said, "Why not bring Mr. Stiefel and put him on the witness stand—I mean Mr. Ahern?" Counsel for plaintiff in error objected, and the assistant State's attorney said, "I meant to say Ahern." It seems apparent the reference by name to Stiefel was inadvertently made and immediately corrected by the counsel who made it. Stiefel was not injured by it, for he was acquitted by the jury. The statement that defendants would have to tell where the money they used came from or take the consequences, their refusal to tell whose money it was or to bring him in as a witness, was very close to a violation of the statute which prohibits any reference or comment to be made upon the neglect of a defendant in a criminal case to testify. Neither plaintiff in error nor Stiefel had testified. It is not clear that the remarks of counsel were made with the intent and for the purpose of calling attention to the fact that defendants had not testified in their own behalf. The State had a right to refer to and comment upon the fact that the source from which the money came which was used by the defendants, as testified to by the witnesses, was unexplained by the defense. It is allowable to call the jury's attention to the fact, where it is the fact, that testimony of witnesses for the prosecution had not been contradicted, even where the defendant is the only person who could contradict such testimony. Advantage should not be taken of this rule, however, to covertly refer to the failure of a defendant to testify in his own behalf. We are disposed to hold in this case that the remarks of counsel for the prosecution were not made for the purpose of calling the jury's attention to the failure of defendants to testify in their own behalf but that they come within the rule stated in *People* v. *Donaldson,* 255 Ill. 19, *People* v. *McMahon,* 244 id. 45, and *Lipsey* v. *People,* 227 id. 364.

279 — 28

When Mrs. Henning was called to the stand to testify she had on a veil, and counsel for plaintiff in error objected to her wearing the veil while giving her testimony and requested that the court direct her to remove it. The veil, as shown by the statement of counsel read into the record, extended from the witness' hat to and below her chin and from the right ear to the left ear, and was a thin, transparent, net veil. We think the court should have required the witness to remove the veil, but the error in refusing to do so does not necessarily require a reversal of the judgment. It is important that the jury may have an opportunity to look into the face of a witness and observe its expression as an aid in determining the degree of credit and weight that should be given to the testimony, and if it appeared that the veil worn by the witness was of such a character as to have entirely obscured her face from view by the jury the error might be regarded as so harmful as to be fatal to sustaining the judgment. It appears, however, from the colloquy between court and counsel, which is preserved in the record, that the veil did not prevent the jury from seeing the face of the witness. The veil is described as a thin, transparent, net veil. The court stated that the jurors had no trouble about seeing the witness' face, and inquired of the jury if they had any difficulty in seeing Mrs. Henning's face or the expression thereon, to which inquiry no response was made. The court stated he could see her face very clearly. We are of opinion, therefore, the error was not of a character to require reversal of this judgment.

Complaint is made of the rulings of the court in giving instructions for the prosecution and in refusing instructions for the defense. The instructions given for the prosecution cover fifteen pages of the abstract and those for the defense thirteen pages. A large number of instructions asked for the defense were refused. Many of the criticisms on this branch of the case are devoted to the alleged insufficiency of the indictment. No complaint was made in the Appel-

late Court of instructions given or refused, but we have examined the instructions and the argument of plaintiff in error and are of opinion no reversible error was committed in this respect, and are further of opinion that no useful purpose could be served by extending this opinion in a discussion of them or of other errors alleged and not herein referred to.

The judgment is affirmed.          *Judgment affirmed.*